IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


SHELLY GUTHRIE,              )
        Plaintiff,          )
                      )
        vs.              )    Civil Action No. 07-821
                      )
LEONARD M. BAKER, individually    )    Judge Cercone
and in his official capacity,        )    Magistrate Judge Mitchell
CONSOLIDATED DELIVERY AND       )
WAREHOUSING, LIKEN STAFFING     )
SERVICES, FEDEX SMARTPOST, INC.,   )
and FEDEX GROUND PACKAGE        )
SYSTEM, INC.,              )
        Defendants.          )

## REPORT AND RECOMMENDATION

I.    Recommendation

It is respectfully recommended that the motion for summary judgment submitted on

behalf of Defendants Liken Staffing Services, FedEx SmartPost, Inc. and FedEx Ground Package

System, Inc. (Docket No. 33) be granted with respect to Count III and denied with respect to

Counts I and II. It is further recommended that the joint motion for sanctions submitted on

behalf of Defendants Liken Staffing Services, FedEx SmartPost, Inc. and FedEx Ground Package

System, Inc. (Docket No. 36) be denied.

II.    Report

Plaintiff, Shelly Guthrie, brings this action pursuant to 42 U.S.C. §§ 2000e to 2000e-17

(Title VII) and the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 (PHRA), against

Defendants, Leonard M. Baker, Consolidated Delivery and Warehousing ("Consolidated"), Liken

Staffing Services ("Liken"), FedEx SmartPost, Inc., and FedEx Ground Package System, Inc.

(together "FedEx SmartPost"). She alleges that they discriminated against her on the basis of her

gender, subjected her to a sexually hostile work environment to the point that she was

constructively discharged on July 12, 2006 and retaliated against her when she complained about

harassment by Leonard Baker, owner of Consolidated.

Presently before this Court for disposition is a motion for summary judgment filed by

Defendants FedEx SmartPost and Liken. They contend that they should be dismissed from this

action on the ground that the alleged harassment occurred at a time and place that were not

related to her work for them, but rather occurred in Baker's truck while she was working for him.

They have also filed a motion for sanctions pursuant to Rule 11 of the Federal Rules of Civil

Procedure, in which they contend that the inclusion of them as defendants in this action, or the

continued prosecution of it against them after the facts became clear, is wholly unwarranted by

existing law. For the reasons that follow, the motion for sanctions should be denied and the

motion for summary judgment should be granted with respect to Count III (Plaintiff has

withdrawn her retaliation claim) and denied with respect to Counts I and II (hostile work

environment and constructive discharge).[1]

Facts

Liken is a staffing agency that places employees in temporary positions with clients,

typically light industrial and administrative companies. (Chappell Dep. at 6.)[2] Liken is a

subcontractor of Hatch Staffing. (Chappell Dep. at 8.) Hatch Staffing contracts with FedEx

SmartPost to provide temporary workers at FedEx SmartPost's facility in Leetsdale,

---

[1]Counts IV and V are against Baker and Consolidated, not these defendants.

[2]Unless otherwise indicated, all excerpts from Keri Chappell's deposition are contained in the moving defendants' appendix (Docket No. 35), Exhibit B.

Pennsylvania (the "Leetsdale Facility"), although Liken deals directly with FedEx SmartPost. (Chappell Dep. at 8; Fitlin Dep. at 7.[3]) FedEx SmartPost generally would tell Liken how many people it would need for a particular shift, sometimes naming a particular individual who had previously done a good job. Liken provided the people to work the shifts and assigned the people to the shifts. (Fitlin Dep. at 40-41.)

The Leetsdale Facility consolidates packages from all over the country for delivery to post offices in surrounding parts of Western Pennsylvania, Northern West Virginia, Eastern Ohio and Western New York. FedEx SmartPost sorts the packages by ZIP code. Each post office for which there are packages on any given day will have one or more pallets (also known as skids) on which the sorted packages are stacked and wrapped. The skids are then loaded onto trucks and delivered to the post offices by independent contractors. (Fitlin Dep. at 5-6, 20.)

On-Time Delivery is an independent contractor that delivers skids of packages to post offices out of the Leetsdale Facility. (Fitlin Dep. at 7-8.)[4] Consolidated is a subcontractor of On-Time Delivery owned by Leonard Baker. (Fitlin Dep. at 8; Baker Dep. at 6, 13.[5])

Plaintiff completed an employment application with Liken on June 1, 2006. (Guthrie Dep. at 31.)[6] In connection with completing her employment application, she received an

---

[3]Unless otherwise indicated, all excerpts from Gene Fitlin's deposition are contained in the moving defendants' appendix (Docket No. 35), Exhibit C.

[4]Plaintiff initially named On-Time Delivery as a defendant. However, in her amended complaint, she removed On-Time Delivery.

[5]Docket No. 35 Ex. D.

[6]Unless otherwise indicated, all excerpts from Plaintiff Shelly Guthrie's deposition are contained in the moving defendants' appendix (Docket No. 35), Exhibit A.

employee handbook from Liken.  It contained a sexual harassment policy which she read.  She understood that she was to contact Liken if she felt she had been harassed, that she would not be retaliated against for complaining about harassment and that her complaint would be investigated promptly and that appropriate action would be taken.  (Guthrie Dep. at 37-39.)  Liken notes that the policy extends to harassment that occurs on the premises of business where their clients are placed, in this case, the Leetsdale Facility.  (Chappell Dep. at 9-10.)  Plaintiff also saw a sexual harassment notice posted at the Leetsdale Facility and saw it every day.  (Guthrie Dep. at 45-46.)

Plaintiff began working as a Liken employee on June 8, 2006.  The assignment to which she reported was a temporary, part-time parcel assistant at the Leetsdale Facility.  (Guthrie Dep. at 25, 31-32, 54.)  Her job was to wrap packages onto skids, position the skids, and sometimes load the skids onto the appropriate truck.  (Guthrie Dep. at 51-53.)

She began work at midnight.  (Guthrie Dep. at 57.)  At the beginning of her shift, she reported to FedEx SmartPost manager Shawn Evans, who told her what her tasks would be for the night.  (Guthrie Dep. at 46; Fitlin Dep. at 17-18.[7])  She had requested the 12:00 a.m. to 5:00 a.m. shift because she has children and working other shifts created issues with child care. (Guthrie Dep. at 29, 136.)[8]

Plaintiff Meets Baker

Plaintiff met Baker at the Leetsdale Facility sometime during the first week she began working there.  He was there as a driver for On-Time Delivery.  She understood that he was not a Liken or FedEx SmartPost employee and that he had no authority to hire, fire, demote, promote

---

[7]Pl.'s App. (Docket No. 42) Ex. B.

[8]Docket No. 42 Ex. A.

or discipline her for FedEx SmartPost.  Baker never told her what to do when she worked at the Leetsdale Facility.  (Guthrie Dep. at 61-62, 72-73, 75, 162-63.)

Baker got his paperwork from On-Time Delivery in an office at the back of the terminal that all of the drivers at the terminal used for paperwork.  (Guthrie Dep. at 49.)  Baker told Plaintiff that it was his office.  (Guthrie Dep. at 48.)[9]  He arrived at the Leetsdale Facility toward the end of Plaintiff's shift or sometimes earlier.  (Guthrie Dep. at 76; Baker Dep. at 77.[10])  She said that every night she worked he would come over to talk to her "a lot," but she also stated that he "talked to pretty much everybody."  (Guthrie Dep. at 76-77.)

Plaintiff notes that the Leetsdale Facility is a 100,000 square foot warehouse and that there were only four or five people working at the facility during the 12:00 a.m. to 5:00 a.m. shift that she worked.  (Fitlin Dep. at 11, 18-20;[11] Guthrie Dep. at 53; Docket No. 42 Ex. F.)  Baker's office was near the loading docks and Plaintiff worked in close proximity to this office and therefore to Baker.  (Guthrie Dep. at 48.)[12]

Baker asked Plaintiff if she knew of anyone who would be interested in becoming a driver for him, and he specifically asked whether she would be interested in the job.  (Guthrie Dep. at 65-66.)  In that initial conversation, he did not touch her inappropriately or say anything inappropriate to her.  (Guthrie Dep. at 72.)  Subsequently, he "brushed up" against her back on

---

[9]Docket No. 42 Ex. A.

[10]Docket No. 42 Ex. E.

[11]Docket No. 42 Ex. B.  Fitlin mistakenly said "1,000 feet" but then corrected this statement to 100,000 square feet in his errata sheet.  (Docket No. 48 Ex. A.)

[12]Docket No. 42 Ex. A.

two occasions, but she did not think there was anything inappropriate about it because in both instances the surroundings were tight and Baker was attempting to squeeze through the area. (Guthrie Dep. at 77-80, 172.)  She decided to accept the job to drive a truck for Baker to earn some extra money as she and her husband were having financial difficulties.  (Guthrie Dep. at 175.)[13]

Plaintiff told Baker that she would drive for him.  She planned to continue working her night shift at the Leetsdale Facility and, when she was done there, she would drive for him about eight hours per day, starting at 5:00 or 6:00 a.m.  (Guthrie Dep. at 81-82.)

The First Day

On July 5, 2006, Plaintiff met with Baker so that he could show her the route she would be driving.  She completed her shift at the Leetsdale Facility at 3:30 a.m. and she went to an Eat 'N Park to have breakfast.  Baker called her at about 5:00 a.m. and told her to come back to the Leetsdale Facility because he was ready to go.  (Guthrie Dep. at 96-98.)

When Plaintiff and Baker got into the truck to drive the first trip on July 5, 2006, Baker sat right next to her instead of on the passenger side.  (Guthrie Dep. at 98.)  During this trip, Baker put his hand on her upper thigh and said things such as he's J.R. and he can buy anything he wants.  (Guthrie Dep. at 99-100, 201.)[14]

Baker kept touching her leg, rubbing her arm and trying to hold Plaintiff's hand.  (Guthrie Dep. at 199, 202.)  Plaintiff told Baker his behavior was inappropriate.  (Guthrie Dep. at 111, 208.)  He responded that she was "wet behind the ears," which she understood to mean that she

---

[13]Docket No. 42 Ex. A.

[14]Docket No. 42 Ex. A.

was naive about sexual matters.  It took approximately eight to ten hours to finish the route and the trip was "very emotionally difficult" for Plaintiff and she cried.  (Guthrie Dep. at 204-08.)  She acknowledged that none of these acts took place at the Leetsdale Facility.  (Guthrie Dep. at 99-100, 199.)

Plaintiff believed she had made it clear to Baker that she would not agree to any of his advances by telling him his actions were inappropriate, and decided to go on the route with him again on July 6, 2006.  (Guthrie Dep. at 101, 103, 111.)[15]  Plaintiff believed Baker was "testing the waters" and that he would stop his advances.  (Guthrie Dep. at 209-10.)[16]

The Second Day

On July 6, 2006, after Plaintiff finished her work at the Leetsdale Facility, Baker asked her to come into his office and fill out a contract.  (Guthrie Dep. at 182-83.)[17]  The contract makes no mention of FedEx SmartPost or Liken.  Plaintiff does not dispute that, when she was driving Baker's truck, she was not working for Liken or FedEx SmartPost.  (Guthrie Dep. at 106-07, 110, 164, 187, 231 & Exs. 6, 9.)

After she signed the contract, she went with Baker to Eat 'N Park for breakfast.  This was the first time she had ever had breakfast with him.  (Guthrie Dep. at 104-05.)  They then returned to the Leetsdale Facility to get his truck and leave to make deliveries.

Plaintiff states that, while she was making deliveries with Baker that day, he again sat right next to her in the truck, put his hand on her leg, and tried to hold her hand.  During this trip,

---

[15]Docket No. 42 Ex. A.

[16]Docket No. 42 Ex. A.

[17]Docket No. 42 Ex. A.

Plaintiff tried to always keep a coffee cup or cigarette in her hand so he could not hold her hand. (Guthrie Dep. at 111, 211-12.)

Baker told Plaintiff that he would not have hired her if she was not a beautiful girl and that he would like to see her in a skirt. (Guthrie Dep. at 112.) Plaintiff told Baker she did not like his advances and the way he was talking to her. After that, he stopped talking to her for a while and stopped helping her deliver the pallets on the truck. (Guthrie Dep. at 113-14.)

After this, Plaintiff pulled the truck over so Baker could fix a problem with the glove box. Baker leaned over, ran his hand up her leg, rubbed her vagina and tried to kiss her. (Guthrie Dep. at 114-15, 117.) At one point, Baker brushed up against her breast. (Guthrie Dep. at 116.) Plaintiff again told Baker these actions made her uncomfortable and he replied she should just get used to it. (Guthrie Dep. at 215.)[18]

Baker told Plaintiff he got a "boner" when he saw her and that he would pay her "more money." Plaintiff responded that she was not a prostitute and was not for sale. (Guthrie Dep. at 215-16.)[19] The July 6, 2006 trip lasted about the same amount of time as the first trip. (Guthrie Dep. at 210.)[20]

Plaintiff states that she attempted to file a police report with the Leetsdale Police Department. She was told the matter was out of their jurisdiction as the incidents occurred in

[18]Docket No. 42 Ex. A.

[19]Docket No. 42 Ex. A.

[20]Docket No. 42 Ex. A.

Ohio. (Guthrie Dep. at 118-19.)[21]

By prior arrangement with Shawn Evans, a FedEx SmartPost manager, Plaintiff did not work at the Leetsdale Facility the next day, July 7. She spoke with Evans that day to make sure she could have the night off, but did not tell him anything about the incidents with Baker. (Guthrie Dep. at 105-06, 122-26.) On that same day, Plaintiff contacted the Beaver County office of the Equal Employment Opportunity Commission (EEOC), but was told to contact another office because it was out of that office's jurisdiction. (Guthrie Dep. at 121-22.)

Plaintiff was next scheduled to work at the Leetsdale Facility on Monday, July 10, 2006. Baker was not there–he had told Plaintiff he would be out the entire week. That night, she told a co-worker named Jennifer that Baker had made her uncomfortable and that she was having problems with him. Jennifer told Plaintiff to tell Evans about what happened, but Evans was not at work that night. She did not tell anyone else about it during that shift. (Guthrie Dep. at 123-26.)

Plaintiff Reports the Incidents to FedEx SmartPost

The next night, July 11, 2006, Plaintiff went to work and told a FedEx SmartPost employee named Becky some of what Baker had said and done, but did not get into details with her. Becky told Plaintiff that she had noticed the way Baker behaved around her. Becky stated that Baker watched Plaintiff all of the time at the Leetsdale Facility when she was not looking. On Plaintiff's days off, he would ask Becky where his "little blonde" was. (Guthrie Dep. at 128-29.)

Becky brought Plaintiff to talk to Linda Stratton, the Arrival and Departure Clerk at the

---

[21]Docket No. 42 Ex. A.

Leetsdale Facility. Plaintiff states that she believed at first that she would be able to simply quit working for Baker and just forget about it, but she was unable to do so. Plaintiff told Stratton what happened, and indicated that it had not occurred at the Leetsdale Facility. (Guthrie Dep. at 126, 128-30.)

Stratton told Plaintiff that she would take up the matter with Gene Fitlin, the hub manager (the most senior manager) at FedEx SmartPost. Stratton also encouraged Plaintiff to tell Liken what had happened. (Guthrie Dep. at 130; Fitlin Dep. at 8.) Plaintiff then finished her shift and went home to sleep. (Guthrie Dep. at 131, 133.)[22]

<u>The Investigation and Response</u>

On July 12, 2006, Fitlin learned from Stratton that Plaintiff was alleging that she had been harassed by Baker. He immediately contacted his human resources manager for advice, and he also contacted Keri Chappell at Liken and Chris Jenkins at On-Time Delivery. (Fitlin Dep. at 8, 20-24, 28-30.)

Chappell returned Fitlin's call and learned about Plaintiff's complaints concerning Baker. (Chappell Dep. at 12-13.) Because Baker and Plaintiff were not employees of FedEx SmartPost, Fitlin asked Liken and On-Time Delivery to look into Plaintiff's complaint for themselves and both Chappell (at Liken) and Jenkins (at On-Time Delivery) said they would do so. (Fitlin Dep. at 28, 30, 33.) Fitlin states that he had multiple discussions about Plaintiff's complaint with Jenkins. (Fitlin Dep. at 29.) Fitlin told Jenkins that the events seemed to happen in Baker's truck and not at FedEx SmartPost's facility and that Jenkins should look into it. (Fitlin Dep. at 30.)

---

[22]Docket No. 42 Ex. A.

That same day, July 12, 2006, Chappell called Plaintiff and got a call back from her around 10:00 a.m. Plaintiff did not get into specifics on the phone, merely telling Chappell that she was being harassed by someone at work. Chappell told Plaintiff she needed to come into the office immediately. (Chappell Dep. at 13-14.) At about 11:30 a.m., Plaintiff arrived at the Liken office, sat down and wrote out a statement for Liken. Chappell asked her to provide a very detailed statement. (Guthrie Dep. at 62, 132-33, 171 & Ex. 8; Chappell Dep. at 14.) When Plaintiff finished, Chappell said she would look into the matter. (Guthrie Dep. at 133.)

Chappell then contacted Fitlin and they met at the Leetsdale Facility to discuss the statement that Plaintiff had written. (Chappell Dep. at 14-15; Fitlin Dep. at 23.) During the meeting, Chappell and Fitlin discussed the fact that the incidents had not occurred on Liken's time or on FedEx SmartPost's property. Chappell asked if it would be possible for Plaintiff to work a different shift and Fitlin told her that she could do so. (Chappell Dep. at 14-15.)

Later that same day, Chappell called Plaintiff at home and told her that Baker was on vacation for the week and asked her if she would work her regular shift or a different shift. Plaintiff already knew about Baker's absence because he had told her he would be out the week of July 10. Plaintiff committed to working her regular shift that night. According to Plaintiff, she told Chappell that she did not want to go back to work while Baker was there and Chappell responded that she did not have to worry about him because he had prostate cancer. (Guthrie Dep. at 125, 134-36; Chappell Dep. at 17, 35.)

Plaintiff did not report for work on July 12, 2006 and she did not call anyone at Liken or FedEx SmartPost to tell them she was not going to come in to work. The last day Plaintiff ever worked at the Leetsdale Facility was July 11, 2006. (Guthrie Dep. at 60, 163.)

Chappell called Plaintiff on July 13, 2006 to ask her why she had not reported to work the previous night and Plaintiff said that she was uncomfortable going back. Chappell then told Fitlin that Plaintiff was not going to be returning to work. (Guthrie Dep. at 138-39; Chappell Dep. at 20, 23, 35.)

On Friday, July 14, 2006, Plaintiff and her husband went to the Liken office to pick up her paycheck. She told Chappell that she had hired an attorney and that she would be suing Baker for sexual harassment. (Guthrie Dep. at 143; Chappell Dep. at 20, 35.) In fact, she had called an attorney's office and spoken to a paralegal, who sent her an intake questionnaire to complete and return. She did not have an interview with the attorney until August 8, 2006, at which she signed a fee agreement and an attorney-client relationship was created. (Kavanagh Aff. ¶¶ 4-8.)[23]

Plaintiff states that, a few days later, FedEx SmartPost manager Shawn Evans called her upon his return from vacation and asked if she would like to work another shift and she said she could do that if Baker wasn't there. (Guthrie Dep. at 139-40, 224.)[24] Plaintiff thought Evans

---

[23]Docket No. 42 Ex. G. The moving defendants insist that, on pages 121-22 of her deposition, Plaintiff testified that she hired an attorney on July 7, 2006. Therefore, they argue that she cannot proffer the affidavit of Caitlin Kavanagh, a paralegal in the office of her attorney, who states that Plaintiff did not call the office until July 14, because this assertion directly contradicts her own testimony. However, when read in context, Plaintiff's testimony is ambiguous and, drawing all inferences in her favor, it demonstrates only that she was describing how she decided to contact an attorney around this time.

[24]The moving defendants focus on Plaintiff's statement on page 140 of her deposition that she said she "probably could" go back to work, arguing that "there is no evidence that Plaintiff ever *did* change her mind." (Docket No. 46 at 5.) However, she testified on the previous page that she would have returned to work if Baker was not there. (Guthrie Dep. at 139.) If Plaintiff contradicted herself at her deposition, then the issue is to be decided by the jury–for purposes of the pending motion, the Court will assume that Plaintiff's testimony consists solely of the

(continued...)

would call Liken to get another shift for her.  (Guthrie Dep. at 140.)  Neither Evans nor anyone else at FedEx SmartPost ever called her back to discuss her working another shift.  (Guthrie Dep. at 139-41, 223.)

The moving defendants note that Plaintiff never told Liken that she had changed her mind and that she was willing to work another shift.  (Guthrie Dep. at 140-41.)  They indicate that, after Plaintiff declined Chappell's offer of a position on other shifts, Chappell told her to get back to her if she was interested.  She never contacted Chappell about accepting another position. (Guthrie Dep. at 170.)

The moving defendants maintain that Plaintiff quit her job with Liken without communicating with anybody.  She "just didn't go back."  (Guthrie Dep. at 223-24.)  She never called in for work again.  (Chappell Dep. at 20.)

Other available shifts at the Leetsdale Facility included from 7:00 a.m. to noon, noon to 3:00 p.m., 3:00 p.m. to 7:00 p.m. and 7:00 p.m. to midnight.  The pay rates were the same for all these shifts, although the responsibilities would be somewhat different.  (Chappell Dep. at 41.) The moving defendants further note that working another shift was an option offered to Plaintiff, not a requirement.  (Chappell Dep. at 17-18; Fitlin Dep. at 25.)  Plaintiff agrees that, if she had worked a day shift, Baker would not have been around her.  (Guthrie Dep. at 140.)

Plaintiff states that, during this period and through July 16, 2006, Baker continued to call her at home.  She recognized the telephone number and did not answer it.  On July 16, Plaintiff's husband answered the phone and Baker asked him whether she would be coming in that night.

---

[24](...continued)
statement that she would have gone back to work if Baker was not there.

Her husband told him no, that she no longer worked for Baker. (Guthrie Dep. at 142, 223.)[25]

Plaintiff believes that Baker was still unaware, five days later, that she had reported his harassment as he would not have called and simply asked whether she was coming to work for him that night. In fact, Baker testified that did not know about her allegations until he received the EEOC Charge, several months later. (Baker Dep. at 57-58.)[26] Baker continued to work at the Leetsdale Facility until August 26, 2007, when On-Time Delivery terminated his contract, an action which he attributes to this lawsuit. (Baker Dep. at 8.)[27]

Procedural History

Plaintiff filed this action on June 15, 2007 and she filed an amended complaint on August 22, 2007 (Docket No. 17). Count I alleges that Baker created a sexually hostile work environment and that she made the various companies named in the complaint aware of it, but nothing was done. Count II alleges that Defendants discriminated against her on the basis of her gender in violation of Title VII and the PHRA, including constructively discharging her from her employment. Count III alleges that she was subjected to retaliation for having complained about Baker's harassment. Count IV is a state law claim for assault and battery against Baker and Consolidated. Count V is a state law claim for intentional infliction of emotional distress against Baker and Consolidated.

On April 30, 2008, Defendants Liken and FedEx SmartPost filed a motion for summary judgment.

---

[25]Docket No. 42 Ex. A.

[26]Docket No. 42 Ex. E.

[27]Docket No. 42 Ex. E.

Summary Judgment

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving defendants contend that: 1) Plaintiff cannot establish the elements of a sexually hostile work environment because the alleged harassing behavior occurred outside the workplace, when she was driving with Baker in his truck for her own purposes; 2) she cannot maintain a constructive discharge claim for the same reason; and 3) she cannot maintain a retaliation claim because she was not subjected to adverse employment actions for reporting the incidents that occurred with Baker and she was offered and refused an accommodation of working shifts when she would not encounter Baker.

In her brief in opposition to the pending motion for summary judgment, Plaintiff indicates that she "is not contending the Defendants retaliated against her for reporting the sexual harassment." (Docket No. 42 at 1.) Therefore, with respect to Count III, the motion for summary judgment should be granted.

However, with respect to her other claims, she maintains that FedEx SmartPost and Liken did not actively investigate her allegations against Baker, did not even speak to Baker and took no action to ensure that he would not harass her at the Leetsdale Facility. She also contends that she has proffered sufficient evidence in support of her constructive discharge claim because she was faced with the prospect of returning to work in close proximity to Baker in a large sparsely populated warehouse in the middle of the night.

<u>Count I: Hostile Work Environment</u>

Title VII provides that:

It shall be an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex....

42 U.S.C. § 2000e-2(a). The PHRA provides, inter alia, that it is an unlawful employment practice:

For any employer because of the ... sex ... of any individual ... to discriminate against such individual ... with respect to ... conditions or privileges of employment or contract, if the individual ... is the best able and most competent to perform the services required.

43 P.S. § 955(a). Claims brought under the PHRA are analyzed under the same standards as claims under Title VII. <u>Weston v. Commonwealth of Pa.</u>, 251 F.3d 420, 425 & n.3 (3d Cir. 2001).

The United States Supreme Court has held that a plaintiff may establish a Title VII violation if she can show that discrimination based on sex created a hostile or abusive working environment. Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998). The Court of Appeals has held that a plaintiff must demonstrate that:

> (1) she suffered intentional discrimination because of her [sex]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006) (citations and footnotes omitted). The moving defendants argue that Plaintiff cannot establish any of the five elements because the incidents did not occur at the Leetsdale Facility. Plaintiff responds that, although the harassment occurred in Baker's truck, FedEx SmartPost and Liken did not investigate the matter and did not adequately respond to her request to be relieved of having to work in the same environment as Baker, namely a large facility with few other people present during her shift where her work area was close to Baker's office. She further argues that, once notified of the harassment, FedEx SmartPost had a duty to ensure that Baker would not harass her on its property, even if he was an independent contractor rather than an employee, and that it failed to take prompt and adequate remedial action.

The issue in this case is not whether Baker's alleged conduct was intentional, whether it was severe or pervasive, whether it detrimentally affected Plaintiff, or whether it would have detrimentally affected a reasonable person in her circumstances. None of these factors are implicated by the moving defendants' arguments, despite their awkward attempt to fit into this rubric. Rather, the only issue in this case is whether the moving defendants can be held liable for conduct that did not occur at their work environment or for their actions or omissions thereafter.

EEOC Guidelines provide that:

> With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) know or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.

> An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees.

29 C.F.R. § 1604.11(d-e).

> The Court of Appeals for the Third Circuit has held that:

> An employer will be liable for the harassing conduct of the alleged victim's coworker if the employer was "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997) (citing Bouton v. BMW of N. Am., Inc., 29 F.3d 103, 106 (3d Cir. 1994)). An employer is negligent if it "knew or should have known about the harassment, but failed to take prompt and adequate remedial action." Jensen v. Potter, 435 F.3d 444, 453 (3d Cir. 2006) (internal quotations omitted). Even if the remedial action does not stop the alleged harassment, it is "adequate" if it is "reasonably calculated" to end the harassment. Id. (quoting Knabe v. Boury Corp., 114 F.3d 407, 412-13 (3d Cir. 1997)).

Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007) (footnote omitted). This is not an affirmative defense, but rather the burden of the plaintiff. However, unlike in a situation involving harassment by a supervisor, in a co-worker harassment situation the issue of whether the employee failed to avail herself of "preventive opportunities" is not present. Id. at 648. In Andreoli, the court concluded that, when an employee had to complain to four supervisors just to get her harasser transferred and then he continued his acts with no further intervention, the issue of whether the employer's response was prompt and adequate had to be determined by the jury.

Although the Court of Appeals has not specifically addressed the scenario of harassment by non-employees, a number of other courts of appeals and district courts have followed the EEOC Guidelines and concluded that employers can be held liable under the circumstances described therein, namely where the employer knows or should have known of the conduct and fails to take immediate and appropriate corrective action.  See, e.g., Lapka v. Chertoff, 517 F.3d 974, 984 n.2 (7th Cir. 2008); Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 n. 2 (11th Cir. 2003); Little v. Windermere Relocation, Inc., 301 F.3d 958, 968 (9th Cir. 2002); Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1244 (10th Cir. 2001); Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 854 (1st Cir. 1998); Crist v. Focus Homes, Inc., 122 F.3d 1107, 1111-12 (8th Cir. 1997); Garziano v. E.I. Du Pont de Nemours & Co., 818 F.2d 380, 387 (5th Cir. 1987); Gliatta v. Tectum Inc., 211 F. Supp. 2d 992, 1002 (S.D. Ohio 2002); Graves v. County of Dauphin, 98 F. Supp. 2d 613, 620 (M.D. Pa. 2000); Kudatzky v. Galbreath Co., No. 96 Civ. 2693(HB), 1997 WL 598586, at *5 (S.D.N.Y. Sept. 23, 1997); Jarman v. Northlake, 950 F. Supp. 1375, 1378 (N.D. Ill. 1997); Sabo v. Lifequest, Inc., No. Civ. A. 95-3757, 1996 WL 583169, at *5 (E.D. Pa. Oct. 8, 1996); Hallberg v. Eat 'N Park, No. Civ. A. 94-1888, 1996 WL 182212, at *8-9 (W.D. Pa. Feb. 28, 1996) (Ambrose, J.); Magnuson v. Peak Tech. Servs., Inc., 808 F. Supp. 500, 512-13 (E.D. Va. 1992), aff'd mem., 40 F.3d 1244 (4th Cir. 1994).  "This theory of liability is grounded not in the harassing act itself ... but rather in the employer's 'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action."  Freitag v. Ayers, 468 F.3d 528, 538 (9th Cir. 2006) (citation omitted).

In this case, Baker could be considered an employee of Consolidated or On-Time

Delivery, but he constitutes a non-employee with respect to Liken and FedEx SmartPost. It is undisputed that, with respect to Liken (Plaintiff's employer) and FedEx SmartPost (the location where she worked), Baker had no supervisory authority over Plaintiff's work and was not even a co-worker.

The moving defendants argue that, although employers may be held liable for acts of harassment by non-employees that occur at their places of work and although they may be held liable for acts of co-workers even if they occur off the work premises, no authority supports imposing liability on an employer for acts of a non-employee that occur outside of work. Plaintiff acknowledges that her complaint is based solely on Baker's conduct that occurred in his truck. (Guthrie Dep. at 172.)

However, courts have found that, under certain circumstances, an area that is not technically a "workplace" can sustain liability for co-worker and even non-employee harassment. In Little v. Windermere Relocation, Inc., 301 F.3d 958 (9th Cir. 2002), a corporate services manager was told to cultivate a business relationship with a client to try to get his account. When she went to a business dinner with the client to discuss the account, he drugged her at the restaurant and she awoke to find herself being raped by him in his car and apartment. When she recounted what happened to co-workers, they said that reporting it would jeopardize her career. When she reported it to a supervisor, she was not removed from the account. When she finally told the company president, he said he did not want to hear about it and reduced her salary. She said that the pay cut was unacceptable to her, and he responded that it would be best if she moved on and cleared out her desk. The court held that she had presented sufficient evidence that the employer had ratified or acquiesced in the rape, which occurred in the "work

environment" as construed to include out-of-office meetings with business clients. See also

Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 135 (2d Cir. 2001) (flight attendant who was

staying in a block of rooms booked by the airline in Rome for an overnight layover when she was

drugged and raped by a male flight attendant was in a "work environment" for purposes of Title

VII and because it had ignored previous reports of rapes by the same individual, its negligence

made it responsible for Ferris's rape).

The truck in which Plaintiff was driving with Baker to learn the route was not a social

event unconnected to work. On the other hand, it is undisputed that Baker's truck did not

constitute a work environment with any connection to Liken or FedEx SmartPost. Rather, it

appears to have constituted a new work environment in which the employer may have been

Baker, Consolidated or both. Thus, for purposes of this motion and the moving defendants,

Baker must be considered a non-employee and the harassment occurred in a location

unconnected to these defendants.

Nevertheless, even if this case presents a scenario of first impression–harassment of an

employee by a non-employee at a non-workplace–the distinction from the situation in which the

harassment occurs at the workplace is one without a difference. The issue remains whether these

defendants had notice of the situation and took prompt and adequate remedial action to ensure

that no harassment would occur at a workplace for which both Liken and FedEx SmartPost

assumed responsibility. "The employer's responsibility is to provide its employees with

nondiscriminatory working conditions. The genesis of inequality matters not; what *does* matter

is how the employer handles the problem." Dunn v. Washington County Hosp., 429 F.3d 689,

691 (7th Cir. 2005) (rejecting the argument that because a doctor was an independent contractor

rather than an employee, the hospital had no responsibility when he harassed many nurses at the facility).  Because liability is grounded not in the harassing act itself but in the employer's negligence and ratification of the harassment through its failure to take appropriate and reasonable responsive action, the fact that the initial harassing act did not take place at the workplace is irrelevant.[28]

This Court predicts that, if presented with this question, the Court of Appeals would apply EEOC Guideline § 1604.11(e) and allow the moving defendants to be held liable if Plaintiff demonstrates that they had notice of Baker's harassment and failed to take immediate and appropriate corrective action, the same standard applied in the case of harassment by co-workers.  As the record is undisputed that the moving defendants had notice of Baker's harassment as of July 12, 2006, the only issue in this case is whether they took immediate and appropriate corrective action.  See Hallberg, 1996 WL 182212, at *11 (after restaurant manager was notified of incident in which customer harassed waitress, she investigated the incident, spoke with customer and warned him that he would be barred from the restaurant if there were any similar complaints, demonstrating prompt action designed to stop the harassment).

Liken and FedEx SmartPost contend that they investigated the matter and tried to remedy the situation by offering Plaintiff alternative shifts so that she would not have to encounter Baker, but that she declined these offers and then, when she may have changed her mind at a later date,

---

[28]Consider the scenario of a new employee who is introduced to her co-workers, one of whom turns out to be a man who harassed her at a prior job.  She immediately notifies a manager and asks not to work in close proximity to this individual.  According to the moving defendants' position, the employer would be justified in responding "so what" (because the prior incidents did not happen at its workplace) and waiting until the harasser strikes again at its workplace before any response is required.

she failed to communicate her decision to the appropriate individuals.  However, Plaintiff responds that the investigation was started but did not continue, that she initially explained that she could not work another shift because it would create problems with child care and that the moving defendants made no attempt to help her and that she later said she would accept other shifts but received no response.

The moving defendants note that, after she made her complaint about Baker, Plaintiff was never subjected to harassment by him again.  (Guthrie Dep. at 140.)  Plaintiff responds that Baker called her at home, but the moving defendants contend that she did testified that Baker only called to see if she was coming in to work.  (Guthrie Dep. at 141.)  The Court need not resolve this dispute because whether Baker continued to harass her after she reported his conduct does not answer the question of whether the response was prompt and adequate.  The mere fact that the harassment fortuitously stops does not demonstrate that the employer acted reasonably.  See Berry v. Delta Airlines, Inc., 260 F.3d 803, 813 n.3 (7th Cir. 2001).

In Knabe v. Boury Corp., 114 F.3d 407 (3d Cir. 1997), the Court of Appeals affirmed the district court's grant of a motion for summary judgment in favor of the defendant employer because the remedial action taken by the plaintiff's supervisor was reasonably calculated to stop the harassing conduct: it conducted an investigation, told the alleged harasser that the company would not tolerate any sexual comments or actions and that violation of this policy would lead to possible suspension and termination.  Significantly, Knabe responded to her employer's investigation and response by informing her supervisor that she could not return to work because the harasser had not been transferred or fired, and that she would pursue her recently filed EEOC charge.  Id. at 413-15.  The Court of Appeals held that an employee does not have the right to

dictate to her employer what remedial action is adequate. However, the fact that Knabe was not subjected to further harassment because she never returned to work did not relieve the employer of its duty to provide a prompt and adequate response, which it did.

The moving defendants contend that Plaintiff declined an offer from Chappell to work on other shifts. (Guthrie Dep. at 136, 140.) She responds that she initially declined the offer because she was emotional and stressed out. In addition, the limited hours and small amount of pay she received at FedEx SmartPost did not justify obtaining child care. But later, when she had settled down, she spoke to Shawn Evans at FedEx SmartPost and said she could work another shift as long as Baker was not there. Neither Evans nor anyone else at FedEx SmartPost ever called her back to discuss her working another shift. (Guthrie Dep. at 136-37, 139-41, 170, 223.)

Chappell stated that she believed it was the responsibility of both FedEx SmartPost and Liken to investigate the situation. However, she did not interview Baker, any witnesses or anyone Plaintiff spoke to regarding the harassment. Chappell does not know if Fitlin ever spoke to On-Time Delivery or Consolidated, or anyone else regarding the harassment. (Chappell Dep. at 16, 32, 37.)[29]

Nothing was discussed with Plaintiff about what would occur once Baker returned from vacation. (Chappell Dep. at 17.) After being notified of the harassment and speaking to Chappell, Fitlin at FedEx SmartPost spoke to Linda Stratton and Becky, Plaintiff's co-worker. (Fitlin Dep. at 22.) However, Fitlin did not speak to Plaintiff or to Baker. Fitlin called On-Time Delivery, but never followed up or heard back from anyone there. (Fitlin Dep. at 22, 24.)

Fitlin indicated that no one from FedEx SmartPost's human resources department

---

[29]Docket No. 42 Ex. D.

conducted an investigation. (Fitlin Dep. at 45, 47.)[30] Fitlin testified that Plaintiff was not an employee, so there was not really a policy that applied to her when she was harassed. (Fitlin Dep. at 27.)[31] He stated that, since the harassment did not occur on FedEx SmartPost property and since neither Plaintiff nor Baker was a FedEx SmartPost employee, he had asked "the associated parties to look into it for themselves." (Fitlin Dep. at 28.)

Fitlin testified that had Plaintiff been an employee, human resources would have become involved and an investigation would have been launched entailing a lot of interviews. The complainant would first be interviewed, then the harasser and witnesses. He noted that there had been a previous complaint of harassment made by a FedEx SmartPost employee, and in that case the complainant, harasser and witnesses were interviewed and the harasser was terminated. (Fitlin Dep. at 14, 16, 27.)[32]

The moving defendants note that Fitlin asked Stratton and Plaintiff's co-worker Becky if they had seen or heard any harassment of Plaintiff by Baker and they said no, that Plaintiff's complaint was the first time that Liken or FedEx SmartPost had received a complaint about Baker and that they did not receive any further complaints about him after Plaintiff's complaint. (Fitlin Dep. at 22, 24, 37; Chappell Dep. at 20, 39.) Plaintiff also stated that she was unaware of any other complaints about Baker. (Guthrie Dep. at 129.) Plaintiff responds that Becky told her

---

[30]Docket No. 48 Ex. A. Plaintiff states that no one from FedEx SmartPost conducted an investigation. As the moving defendants note, Fitlin clarified that he meant no one from the company's human resources department–obviously Fitlin himself conducted the investigation described herein.

[31]Docket No. 42 Ex. B.

[32]Docket No. 42 Ex. B.

she noticed the way Baker behaved around her and that on her days off he would ask where his "little blonde" was. (Guthrie Dep. at 128-29.)

The evidence presents genuine issues of material fact as to the promptness and adequacy of the investigation and response. Although Plaintiff's statement was taken, no one spoke to Baker, the alleged harasser. In addition, the investigation that was conducted appears to have stopped at the point at which Liken and FedEx SmartPost concluded that Baker's alleged harassment had not taken place on their time or their property. In other words, once these defendants discovered that the matter was "not their problem" they investigated no further.

The moving defendants argue that they:

> have no duty whatsoever to investigate or take remedial action for the alleged conduct of Baker during the time that [Plaintiff] pursued employment as a truck driver with his company. Plaintiff can only speculate that she would have continued to suffer the same conduct that allegedly occurred during her employment with Baker's company, Consolidated Delivery and Warehousing.

(Docket No. 49 at 3.) They appear to be suggesting either: 1) that Plaintiff has presented no evidence that Baker would harass her at the Leetsdale Facility because he had not harassed her at that location previously; or 2) that they had no authority to take action with respect to Baker because he was an independent contractor and not a Liken or FedEx SmartPost employee.

The first proposition is not a reasonable inference and certainly not one drawn in favor of Plaintiff as the non-moving party. Although it is possible that Baker might not have harassed Plaintiff at the Leetsdale Facility or that he might have been more cautious about harassing her there as opposed to the seclusion of his truck, it is also possible that, having verbally and physically harassed Plaintiff in his truck, Baker would have been emboldened to behave in a similar way at the Leetsdale Facility. In any event, Plaintiff's concern that Baker would not

confine his harassment of her to the interior of his truck was a reasonable one that should not have been ignored.

The second proposition is not a proper statement of the law. On the contrary, FedEx SmartPost has a duty to ensure that no one is harassed at its facility and Liken has stated that its policy against harassment of its employees extends to the locations where these employees work, in this instance the Leetsdale Facility. The employment status of any harasser is irrelevant. See Lapka v. Chertoff, 517 F.3d 974, 985 (7th Cir. 2008) (when Department of Homeland Security employee was raped by a man working for a sister agency when they were at a mandatory training session in Georgia and he began visiting her office in Chicago, employer had a duty to promptly and adequately respond, which it met by instituting a new policy demanding that visitors be on official business); Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1245 (10th Cir. 2001) (state hospital that ignored psychologist's safety concerns could be held liable when she was attacked by a patient); Lockard v. Pizza Hut, Inc., 162 F.3d 1062, 1074-75 (10th Cir. 1998) (restaurant could be held liable when manager sent waitress back to crude customers who attacked her again).

In fact, despite the arguments in their brief, even the moving defendants recognize their responsibilities with respect to protecting individuals working at the Leetsdale Facility from harassment (regardless of whether the prior harassment occurred at their workplace or not). Gene Fitlin testified that, if Plaintiff's allegations had been supported, he would have requested through Chris Jenkins at On-Time Delivery that Baker be directed to stay away from the Leetsdale Facility. However, he never interviewed Baker and his conclusion that Plaintiff's allegations were unsupported appears to be based on the fact that he never heard back from On-

Time Delivery after he asked Chris Jenkins at On-Time to look into the matter and "I would have expected if they found something they would let me know." (Fitlin Dep. at 31-32, 48.)[33]  Thus, Fitlin appears to be suggesting that FedEx SmartPost's responsibility to take action was not called upon because On-Time Delivery never responded to his inquiry.  Whether or not this approach was adequate is not a matter this Court can determine on a motion for summary judgment.

Moreover, the evidence, taken in the light most favorable to Plaintiff, indicates that no one responded to her when she stated that she would accept an alternate shift so that she would not have to work in Baker's presence.  The moving defendants contend that Plaintiff made this request only to FedEx SmartPost when her employer was actually Liken.  However, until this point, there had been considerable communication among the various companies: Plaintiff complained to FedEx SmartPost about Baker, and FedEx SmartPost informed Liken.  Plaintiff provided a detailed statement to Liken, and Liken shared it with FedEx SmartPost.  Plaintiff told Liken she did not want to work alternate shifts and this information was conveyed to FedEx SmartPost.  Then, when Plaintiff notified FedEx SmartPost that she would be willing to work other shifts, suddenly the communication ceased and Plaintiff was not offered this opportunity because she failed to make this request of Liken directly.  The trier of fact will have to determine whether this result demonstrates that the moving defendants took prompt and adequate remedial

---

[33]The moving defendants state in their reply brief that Baker denied the allegations and thus any follow-up with On-Time Delivery would have further confirmed the "he said/she said" nature of her complaint.  (Docket No. 46 at 4.)  However, they cite no record evidence to support the statement that Baker denied the allegations.  More significantly, the fact that an investigation into a claim of sexual harassment results in a "he said/she said" situation does not relieve an employer from taking prompt and adequate remedial action.  See Knabe, 114 F.3d at 413 (employer need not obtain "corroboration" of sexual harassment before taking remedial action).

action.

FedEx SmartPost has not explained why it could not have told Liken that Plaintiff had requested (and it had approved, since the issue was which shift she would work at FedEx SmartPost's facility) a different shift. Nor has Liken explained why it could not have found Plaintiff another job at a different facility where she would not encounter Baker. The trier of fact will have to consider this evidence and determine whether, under the circumstances, the response by these defendants was "reasonably calculated to end the harassment." Therefore, with respect to Count I, the motion for summary judgment should be denied.

Count II: Constructive Discharge

In Count II, Plaintiff alleges that Defendants discriminated against her on the basis of her gender, culminating in her constructive discharge from her employment, by failing to investigate and respond to her complaints about sexual harassment by Baker. The moving defendants argue that Plaintiff has not demonstrated that she can maintain a claim for constructive discharge. Plaintiff responds that she has proffered evidence that she would have had to return to work in close proximity to Baker in a large sparsely populated warehouse in the middle of the night.

The Supreme Court has recognized that:

> Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?

Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004) (citations omitted). The Court further observed that, as compared to a pure hostile work environment claim, "[a] hostile-environment constructive discharge claim entails something more: A plaintiff who

advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign " Id. at 147 (citations omitted).

Although the parties have framed the issue as one of constructive discharge, the record does not establish definitively how Plaintiff's employment came to an end.[34]  As explained above, the evidence, when taken in the light most favorable to the Plaintiff as the non-moving party, establishes the following: Plaintiff was harassed by Baker in his truck; she reported this harassment to FedEx SmartPost, which in turn reported it to Liken; Liken asked her to come in and write up a detailed statement and she did so; Liken reviewed this statement with FedEx SmartPost and concluded that the harassment had not occurred on their time or property but nevertheless decided to offer Plaintiff the opportunity to work another shift so that she would not encounter Baker; Plaintiff initially declined this offer but shortly thereafter she indicated that she would accept it.  At this point, nothing further happened.

The trier of fact might conclude, as the moving defendants contend, that Plaintiff effectively quit her job by not calling FedEx SmartPost back to follow up on her request to work another shift and/or by not calling Liken to request other employment.  However, the trier of fact might also conclude that these defendants effectively terminated her employment by not calling her back after she indicated that she would be willing to work other shifts and/or by not contacting her to offer her other positions.

Although the issue of whether an employee has suffered an adverse employment action such as termination is usually straightforward, sometimes the evidence is unclear and the

---

[34]For purposes of this discussion, "Plaintiff's employment" refers to her employment by Liken to work at FedEx SmartPost's Leetsdale Facility, but is not limited to the midnight shift.

question must be submitted to the jury.  See, e.g., MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 927-28 (8th Cir. 2004) (after MacGregor was passed over for a promotion which was instead given to a less qualified male employee and after she rejected another position she was offered but found non-feasible and her supervisor then wrote a letter stating that she was leaving the company, the court concluded that "there is a conflict over whether MacGregor quit or was fired after having received an alternative offer of employment."); Durst v. Federal Express Corp., 2005 WL 3534179, at *6 (D.N.J. Dec. 22, 2005) (when FedEx driver told his supervisor he would not drive unsafe vehicles but wrote a letter stating that he would be happy to drive safe vehicles, a genuine issue of material fact existed as to whether he quit or was fired).

Because the record does not establish how Plaintiff's employment came to an end, the Court cannot address the moving defendants' motion for summary judgment with respect to her constructive discharge claim.  If the trier of fact concludes that the moving defendants effectively terminated her employment, then she suffered a de facto discharge and the standards applicable to a constructive discharge claim would not apply.  Therefore, with respect to Count II, the motion for summary judgment should be denied.

Motion for Sanctions

The moving defendants contend that, because the evidence demonstrates that Baker's alleged harassment did not occur on Liken's time or on FedEx SmartPost's property, Plaintiff and her counsel should have dismissed these defendants from this case.  They argue that the failure to do so constitutes a violation of Rule 11 of the Federal Rules of Civil Procedure. Defendants have requested attorneys fees pursuant to Rule 11 of the Federal Rules of Civil Procedure on the grounds that Plaintiff's claims are not "warranted by existing law of by a

non-frivolous argument for the extension, modification, or reversal of existing law or the

establishment of new law." Fed.R.Civ.P. 11(b)(2).

As Judge Standish has noted:

> In addressing a motion for sanctions under Rule 11, it must be
> remembered that the rule is not a fee-shifting device, Gaiardo v. Ethyl Corp., 835
> F.2d 479 (3d Cir. 1987), but should be resorted to only in exceptional
> circumstances. Doering v. Union County, 857 F.2d 191 (3d Cir. 1988). "Rule 11
> sanctions awarding counsel fees do not automatically or usually follow an adverse
> judgment or ruling. Much more is required." Gaiardo, at 483. It is also true,
> however, that Rule 11 sanctions may properly be imposed to deter litigation
> abuse, as when the "claim or motion is patently unmeritorious or frivolous." Id.,
> 857 F.2d at 194. Attorney conduct is judged by a standard of objective
> reasonableness regarding whether the claim is well based in fact and law.
> Manville Sales Corp. v. Paramount Systems, Inc., 123 F.R.D. 177 (E.D. Pa.
> 1988).

Trace Servs., Inc. v. American Meter Co., 141 F.R.D. 47, 49 (W.D. Pa. 1992). In Trace Services,

the court declined to impose Rule 11 sanctions, despite the fact that it had granted the

defendant's motion for summary judgment on the plaintiff's Lanham Act and related state law

claims, because:

> the plaintiff did satisfy the first part of the test for trademark infringement.
> Further, the test applied is a multi-factor one with no bright-line rule, again in
> contrast with defenses which rely on absolute immunity or a statute of limitations.
> While I believe that plaintiff should suffer summary judgment, I do not find any
> evidence that this lawsuit was filed in an effort to harass, or for any other
> improper purpose.

Id. at 50.

In this case, for the reasons explained above, Plaintiff's claims against FedEx SmartPost

and Liken should not be dismissed. Therefore, there is no reason to impose sanctions on her. In

addition, there is no evidence that the law suit was filed against these defendants in an effort to

harass them, or for any other improper purpose. Therefore, Defendants' Joint Motion for

Sanctions should be denied.

For these reasons, it is recommended that the motion for summary judgment submitted on behalf of Defendants Liken Staffing Services, FedEx SmartPost, Inc. and FedEx Ground Package System, Inc. (Docket No. 33) be granted with respect to Count III and denied with respect to Counts I and II. It is further recommended that the joint motion for sanctions submitted on behalf of Defendants Liken Staffing Services, FedEx SmartPost, Inc. and FedEx Ground Package System, Inc. (Docket No. 36) be denied.

Within thirteen (13) days of being served with a copy, any party may serve and file written objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,

s/Robert C. Mitchell
ROBERT C. MITCHELL
United States Magistrate Judge

Dated: August 5, 2008